## Hey *versus* Philadelphia.

1. Roads and bridges are made for ordinary travel; if they fulfil such purpose they are sufficient and those in charge of them are not responsible for extraordinary accidents occurring on them.

2. If a road is so dangerous by reason of its proximity to a precipice, or any other cause, that common prudence requires extra precaution in order to insure safety to travellers, the municipal authorities are bound to use such precaution.

3. If the immediate cause of damage from an imperfect highway be the effect of a precedent cause arising from a neglect of duty by a municipality, it is liable for it.

4. In this case the plaintiff was driving on a road in the city park: his horse became frightened by a locomotive and turned and upset the carriage, and there being no barrier on the road, fell with the carriage into the river and was drowned. The circumstances in this case evidence of negligence in the city in not putting up a barrier.

5. Lower Macungie *v.* Merkhoffer, 21 P. F. Smith 276; Newlin *v.* Davis, 27 P. F. Smith 317; Pittsburg *v.* Grier, 10 Harris 54; Scott *v.* Hunter, 10 Wright 194, compared.

February 4th 1876. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the District Court of *Philadelphia:* Of January Term 1874, No. 267.

This was an action on the case by Michael Hey, against the city of Philadelphia, brought to March Term 1872 of the court below for negligence in not sufficiently guarding one of the roads in the park, by reason of which the plaintiff's horse fell into the river Schuylkill and was drowned, and the carriage and harness injured.

The case was tried before Hare, P. J.

The plaintiff testified that he was driving home through Fairmount Park with two daughters; he proceeded: "I crossed the Reading Railroad, and was approaching the Connecting

[Hey *v.* Philadelphia.]

Railroad bridge.  Just as I came around the bend a train on the other side approached the bridge.  The bridge is very high overhead where it crosses the road.  My horse began to get restive.  There were high rocks on one side of the road; on the other side there was a steep bank faced with rough stones, at the bottom of which was the river.  A horse could not get to the left because of the high rocks, and if he went to the right there was nothing but this bank and the river.  I was afraid on account of my daughters.  I got out and held my horse facing the rocks.  I held him by the head facing the rocks.  I got out because I was afraid my horse might back over the bank.  There was no fence, and I was afraid for my daughters.  My horse backed me, and my foot slipped on a rock at the side of the road, and I fell.  The horse got away from me; he turned short round and upset the wagon, and when I got up the horse and wagon were in the river.  I saw only the wheel.  I did not see them go over, but when I got up they were in the river.  * * *  There was no fence and no barrier between the road and the river.  * * *  The road was a good smooth road, about as wide as Sixth street.  There was a footway between road-bed and the river.  It was raised about usual height and curbed.  It was about six inches higher than the middle part of the road.  My horse was very gentle.  He was not afraid of trains or locomotives.  I was in the habit of driving close by railroads; could drive him close up to a train in motion, and he never shyed.  Train on bridge was high overhead; would be likely to frighten any horse."

Caroline Hey, a daughter, testified: "When we came round the bend of the road the horse became restive and uneasy.  A train was just coming on the bridge.  We could not see until we came round the turn, because of the rocks.  My father got out and held the horse by the head.  He turned him away from the bank, and faced him close up to the rocks on other side.  The horse pushed my father backwards.  He got upon a large stone or rock and slipped and fell.  Then the horse turned short, the wagon upset; and my sister and I were thrown out, and when we got up the horse and wagon were in the river, and my father was halloaing.  * * *  The rocks on one side were very high, so that there was no passage in that direction.  On the other side the bank was very steep down to the river.  The face was rough, covered with rough stone.  If a horse and carriage got over it could not stop until it got into the river.  I drove often with my father.  The horse was very quiet and gentle, never shyed at locomotives; have often seen him driven close to trains and locomotives, both standing still and when in motion; he never showed any fear or uneasiness."

Other witnesses testified substantially in the same manner and also to the value of the horse, &c.

Another witness testified: "I know place where accident hap-

[Hey *v.* Philadelphia.]

pened; approaching it you can't see bridge till you come round curve; the trains run very high over head, and it is a place where even quiet horses are apt to shy and back. A great many pleasure carriages pass there all the time. Horses do frighten there; my own has taken fright and shyed and backed there, and he is a very quiet horse and fearless of locomotives. Under such circumstances some drivers would think it best to get out and hold the horse, and some would sit in wagon and trust to reins. If I was alone I would risk it; if I had women in the carriage I would get out. I knew Mr. Hey's horse; he was very gentle and quiet; not apt to shy at locomotives."

The court submitted the question of negligence to the jury reserving the following points:—

1. Was there any evidence of negligence on the part of the city in the construction of the road?

2. Was there any evidence that the damage to the plaintiff was the result of negligence on the part of the city?

The jury found a verdict for the plaintiff for $505; subject to the reserved points. The court subsequently entered a verdict for the defendant *non obstante veredicto*, Judge Hare delivering the following opinion:—

"The plaintiff was returning to the city from a drive in the East Park. A turn in the road brought him to the margin of the Schuylkill, and in full view of the bridge of the connecting railway. He had the stream on one side, and a high bank of rocks or earth on the other. The road was wide and level, but there was a sharp declivity towards the river, with no guard or protection except a sidewalk raised some six inches above the road. A train was passing over the bridge, and the plaintiff's horse took fright. He got out, took the animal by the head and turned it towards the bank. The horse continuing restive, the plaintiff got on a rock to obtain a better hold, but lost his footing and fell between the fore feet of the horse. The animal, freed from all restraint, turned short round, overset the wagon, sprang across the sidewalk into the river, and was drowned. The plaintiff contended that the city was guilty of negligence in not erecting a guard between the road and the stream, and that the accident was attributable to that cause. The question was left as one of fact to the jury, and the law reserved for the consideration of the court.

"The question may be considered under two heads: First, is there evidence of negligence in the construction of the road; and next, did that negligence occasion the loss. I have found it exceedingly difficult to arrive at a satisfactory conclusion on either point. That the city is responsible for maintaining her highways in a safe condition, and that the question whether a particular highway is safe, must ordinarily be left to the jury, are propositions which no one is likely to dispute. It is also clear under the

[Hey *v.* Philadelphia.]

authorities, that when the road is steep or narrow, with a river, ravine or ditch, at the side, a fence or barrier should be erected of sufficient height to prevent vehicles from being forced off the road by any sudden or ungovernable movement of the animals by which they are drawn. But I am not prepared to admit that this precaution must be observed where the way is level, and there is no reason to suppose that an accident will occur with horses that are obedient to the whip and rein. One who drives a horse which cannot be controlled under ordinary circumstances, and where there is no peculiar cause of alarm, takes the risk, and cannot justly ask compensation if an accident occurs. If this were the whole case, I should incline to think that the question should have been withdrawn from the jury. But there are other circumstances which require consideration. At the point where the accident occurred, the road crosses one railroad track at grade, and then passes almost immediately under another. There are sights and sounds which may excite or alarm a horse that is ordinarily quiet and well broken. There is no other convenient means of access to a park which has been laid out for the health and recreation of the citizens. It was, therefore, the duty of the Park Commissioners to anticipate the danger arising from the proximity of the tracks, and take more than ordinary precautions against the accidents which the situation was calculated to produce.

"We have still to consider whether the negligence of the defendant was a proximate and efficient cause of the injury for which the plaintiff seeks to recover. The accident originated in causes over which the city had no control, and for which she is not answerable. These were: first, the passage of the railway train; next, the ungovernable temper of the horse; and finally, the plaintiff's fall, which left the animal without a master. Up to this point there is certainly nothing for which the city can justly be held answerable.

"Does any responsibility attach for what ensued? A horse which breaks loose from its driver and runs away, under the impulse of fear, becomes, for the time being, a blind brute force. His course is less susceptible of calculation than that of the winds or waves, or of the melting snows on a mountain. Whether he receives or occasions injury, the presumption is, that no one is answerable. To entitle the owner to compensation from the public purse, it should distinctly appear, not only that the authorities were negligent in the construction of the highway, but that the injury would not have been sustained but for their default. This can hardly be alleged in the present instance. In view of what might have happened, we may regard the actual result as fortunate. It is contended, that if the side of the road had been guarded by a fence, the horse would not have been drowned. The soundness of this inference is questionable, because a creature in such a

[Hey *v.* Philadelphia.]

state of terror might have surmounted any ordinary barrier. If accepted as just, it would not aid the plaintiff. The horse would, in all probability, have sped down the road and been brought into collision with the archway of the bridge, or some passing vehicle. Nor is this all; in such a crowded thoroughfare, human life might have been sacrificed. If it be said that this is speculative, and that the inquiry, whether the want of a safeguard was an efficient and concurrent cause, was one of fact for the jury; the answer is, that guessing is no part of the judicial function, by whomsoever exercised. The plaintiff must present some ground on which the mind can proceed with certainty to judgment. If he fails in this, he is not entitled to a verdict. This may sometimes be unfortunate; but the evil would be greater if the jury were permitted to draw inferences at random.

"It is established, in Maine and Massachusetts, that no recovery can be had for an accident occasioned by a frightened or vicious horse, although it might not have occurred but for a defect in the highway at the point where the horse is injured, or the carriage broken: Davis *v.* Dudley, 4 Allen 557; Titus *v.* Northbridge, 97 Mass. 258; Fogg *v.* Nahant, 98 Id. 578; Moulton *v.* Sanford, 51 Maine 127; Moore *v.* Abbott, 32 Id. 66. Agreeably to these authorities, if the horse was unmanageable when the accident occurred, it is immaterial, so far as the public liability is concerned, that the driver kept his seat and the reins, and might have regained his control over the animal. I incline to think that as long as the struggle between the human and brute will continues, and there is a possibility that the man may prevail, he is entitled to protection against any default tending, although incidentally, to turn the scales. See Lower Macungie Township *v.* Merkhoffer, 21 P. F. Smith 276. But the point does not arise in this instance, where the occupants of the carriage were all precipitated to the ground before the horse made the plunge which led to his death."

The plaintiff took a writ of error and assigned for error the entering of judgment on the reserved points.

*R. P. White*, for plaintiff in error.—A traveller has a right to presume that a highway in use is safe, and even if he knows of defect in it, he is only bound to use ordinary care in avoiding the danger: Shearman & Redfield on Negligence 413, 414, and cases cited; Humphreys *v.* County of Armstrong, 6 P. F. Smith 204. A town bound to provide for the safety of travellers ought particularly to guard against happening of accidents at railroad crossings: Orcut *v.* Kittery Point Bridge Co., 53 Maine 500. They are not ordinarily bound to fence roads, but are bound to fence at places otherwise unsafe for travellers exercising ordinary care: Collis *v.* Dorchester, 6 Cush. 396. Whether fence is necessary is a question for the jury: Booker *v.* Anderson, 35 Ill. 65;

[Hey v. Philadelphia.]

Hyatt v. Rondout, 44 Barb. 385; Norris v. Litchfield, 35 N. H. 271; Macungie Township v. Merkhoffer, 21 P. F. Smith 476. This was one of the ordinary incidents and dangers of travel which the city was bound to guard against by every reasonable means in their power : Scott v. Hunter, 10 Wright 194; Lund v. Tyngsboro', 11 Cush. 563; Pittsburg v. Grier, 10 Harris 54. It was a question of fact for the jury whether the want of a safeguard was an efficient and concurrent cause of the injury, and there was ample evidence for them to pass upon it : Allen v. Willard, 7 P. F. Smith 378; Hays v. Gallagher, 22 Id. 136; McKee v. Bidwell, 24 Id. 218.

*R. N. Willson* (with whom was *C. H. T. Collis*, City Solicitor), for defendant in error.—The city claims that she is not bound to put or keep any or all of her highways in a condition which will insure or promote safety to horses which have broken away from, and are not under the control of their drivers, for the reason that the use of a highway by such an uncontrolled animal is not an ordinary, natural and legitimate use : Davis v. Dudley, 4 Allen 557 ; Titus v. Northbridge, 97 Mass. 258; Fogg v. Nahant, 98 Id. 578; Moulton v. Sanford, 51 Me. 127 ; Linton v. Chester, 1 Weekly Notes 192.

Mr. Justice GORDON delivered the opinion of the court, March 13th 1876.

The jury found that the city authorities were derelict in duty in not placing proper guards or barriers along the river side of this very dangerous piece of road, and that this neglect was the proximate cause of the loss complained of by the plaintiff. The court on the other hand, regarded the fright and breaking away of the horse as the immediate cause of the disaster, and hence entered judgment for the defendant, *non obstante veredicto.* Herein we think the court erred. It is true that ordinarily provision is not to be made against contingencies so rare as runaway horses. Roads and bridges are constructed for the purpose of ordinary travel, and if they fulfil such purposes they are sufficient, and those who have them in care are not chargeable with the results of extraordinary accidents that may occur upon them.

These things must, however, be governed by common reason and observation. A road may be perfectly safe under some circumstances and very unsafe under others. A way of ten feet in width, in the open country, may be as secure as one of ten times that width, but along the brow of a precipice such a way would be very insecure. Perhaps, indeed, a steady, sure-footed team, handled by a cool and skilful driver, may pass over it as securely as over the former, but drivers of only ordinary nerve, with fractious teams are unsafe upon it, and it is just for this reason that such a road

31 P. F. SMITH—4

[Hey *v.* Philadelphia.]

should be provided with guards which, under ordinary circumstances, would not be essential. As was said, *per curiam*, in the case of Lower Macungie Tsp. *v.* Merkhoffer, 21 P. F. Smith 276, " a highway must be kept in such repairs that even *skittish* animals may be employed without risk or danger on it." So we have held that where a horse frightened and backed off a bridge, the township was responsible for the loss resulting therefrom because of the neglect of the supervisors in not providing side railings, by which notwithstanding the fright of the horse, the accident might have been prevented. Newlin Tsp. *v.* Davis, 27 P. F. Smith 317. Had this accident happened upon an open and unrailed bridge, under circumstances similar to those exhibited by the evidence now under consideration, there could be but one opinion as to the liability of the city. In such case the proximate cause of the disaster would be so obvious that no one could avoid its observance. Given secure side guards, and the driver is under no apprehension of immediate danger, whether his horse attempts to run or back ; in either case he retains his seat and the lines, and has a reasonable chance to save himself and his property—remove the guards, and he is at once surrounded by circumstances of extreme danger, calculated to appal an ordinary person, and it may, indeed, be the best thing he can do to abandon horse and carriage to their fate and endeavor, as best he may, to save his own life. Here the circumstances created by the neglect of the public authorities, are such as to render the accident not only possible but probable, and it is against such probabilities that they are bound to provide, and the want of such provision is negligence *per se.* There is, however, no reasoning which applies to a bridge that does not also apply to a road, for a bridge is but part of a road. If the road is so dangerous, by reason of its proximity to a precipice, or any other cause, that common prudence requires extra precaution, in order to insure the safety of the travelling public, why shall not the authorities be bound to such precaution.

Now that Hey was surrounded by circumstances calculated to excite alarm in the mind of an ordinary person, no one can well deny ; that the unfenced precipice was a dangerous element, which would naturally beget such alarm, will no doubt also be conceded, and that he did nothing that a man of prudence ought not to have done the jury have found. Where then was the fault ? Was it not to be found in this unguarded declivity ? But it is said the running away of the horse was the proximate cause of the injury, and had it not gone over the bank it might have gone farther with the same result in the end. This, however, does not follow, nor is it necessarily to be conceded, for ordinarily a dead horse does not result from a runaway, and, hence, had there been proper guards at this place, the chances are ten to one the horse, at least, would have been saved. Granting, however, that the runaway was the imme-

[Hey v. Philadelphia.]

diate cause of the whole disaster, still the question remains, what produced the runaway? In Pittsburg v. Grier, 10 Harris 54, the immediate cause of the sinking of the steamer, was the striking of some heavy body floating in the stream, nevertheless as the *causa causans* was some piles of pig metal, negligently permitted to lie on the public wharf, thus obliging the boat to occupy a position more dangerous than it otherwise would have occupied, the city was held liable. A like case is that of Scott v. Hunter, 10 Wright 194, in which Pittsburgh v. Grier is approved.

Thus we see that the immediate cause of the damage, may be but the effect of a precedent cause, and if the latter arises from a neglect of duty chargeable upon a municipality, such municipality is liable therefor.

As therefore, the jury, in view of all the circumstances of this case, might legitimately find that the losing of the control of his horse by Hey, resulted from the alarming character of the unfenced precipice, inducing him to jump from his carriage in order to save himself and his children from the threatened danger, we conclude that for this reason, if for none other, the verdict should have been permitted to stand.

We do not regard the cases to which we have been referred by the counsel for the defendant in error as in point. In all of them the immediate cause of the accidents complained of was the running away, or loss of control of the horses, occasioned by accidents unconnected with the condition of the roads over which they were passing. As in the case of Davis v. Dudley, 4 Allen 557, where the bolt, connecting the cross-bar and thills with the sleigh, broke and let them fall on the horse's heels, thus frightening it and causing it to run away, and during its flight it broke one of its legs upon a pile of wood lying in the road—it was held that the town was not liable. But if we reverse the case and suppose the fright of the horse to have been occasioned by some prudent endeavor of the driver to escape the danger of an obstruction in the highway, it is probable the decision would have been different. It is, however, only under the latter statement of the case that it becomes similar to that under consideration; hence it and its kindred cases have no applicability to the discussion in hand.

> The judgment of the District Court is now reversed, and a judgment for the plaintiff below is entered on the verdict, and the record is directed to be remitted to the court now having jurisdiction of the records of said District Court for execution.

Chief Justice AGNEW and Mr. Justice PAXSON, dissented.