# Martin Dixon v. The Township of Butler, Appellant.

*Negligence—Township liability for defective roads—Degree of care.*

As a general rule township supervisors are in no wise responsible for the condition of land outside the limits of the road. They are only bound by conditions which create a danger so manifest that it is negligence not to employ the obvious means of guarding against it; and this must be done so effectually that even skittish animals may pass with safety. Where no danger may be anticipated from a cause existing beyond the limits of the roadway no duty in respect to such cause devolves upon the supervisors. They are not bound to anticipate danger to which a frightened horse may expose the driver.

*Negligence—Highways—Township liability—Proximate cause.*

If a defect in the highway be merely coincident with a distinct and unrelated cause, for which the township is not responsible, and without which the injury would not have happened, the latter is to be regarded as the proximate and the former as the remote cause.

*Practice, C. P.—Negligence—Allegata and probata—Variance.*

It is error to leave a question of negligence to a jury where there was nothing in the pleadings to give notice that such a question would be contended for on the part of the plaintiff, and that a failure to perform it would be set up as the negligence complained of.

*Highway—Danger—Degree of care—Province of court and jury.*

The liability of a township for its roads is based upon negligence and not danger. All grade crossings are dangerous and it is error to leave to the jury the question of negligence based upon the assumption that a particular crossing was dangerous, and that the township was by law required to provide means of wholly avoiding the danger.

Argued Dec. 7, 1896.   Appeal, No. 59, Nov. T., 1895, by defendant, from judgment of C. P. Schuylkill Co., May T., 1885, No. 223, on verdict for plaintiff.   Before Rice, P. J., Willard, Wickham, Beaver, Reeder, Orlady and Smith, JJ. Reversed.

Trespass for personal injuries.   Before Green, J.

The facts sufficiently appear in the opinion of the Court.

Verdict and judgment for plaintiff for $983.81.   Defendant appealed.

*Errors assigned* among others were (7) in refusing to charge as requested by the defendant in the eighth point, which point and answer are as follows:

" 8. As the evidence is undisputed that the horses were frightened by the locomotive or the approaching train, in consequence of which they ran with the carriage into the moving train then crossing the public road, and as the evidence is undisputed that the horses were not frightened and did not run into the moving train by reason of anything in or connected with the public road, the condition of the public road was not therefore the proximate cause of the accident, and the verdict of the jury should be for the defendant. *Answer:* This point we decline to affirm, but we reserve for future consideration the question whether the failure to provide an overhead crossing was the cause of the damage to the plaintiff, and whether such failure was any evidence of negligence on the part of the defendant."

(9) In not entering judgment for the defendant non obstante veredicto on the question of law reserved, viz:

Charge of court: The question is one both of law and of fact. We submit the question of fact to you for the purpose of determination; we will reserve the question of law, as to whether the township authorities would be compelled, under such circumstances, to build an overhead bridge.

*S. H. Kaercher* and *W. A. Marr*, for appellant.—There were two questions raised by the evidence in these cases which the court below submitted to the jury. First, Was Martin Dixon, the plaintiff in one case, who controlled the management and direction of the horses and the carriage occupied by his wife and Mary Cuff (for whose death Patrick Cuff, the plaintiff in the other case, claims damages) guilty of such contributory negligence as to defeat a recovery? Second, Was the appellant guilty of negligence in not constructing an overhead bridge at the point where the railroad crossed the public road?

A road that is in suitable condition for ordinary travel, conducted in the ordinary manner, does not become defective because some extraordinary condition not foreseen arises, in consequence of which it is, for the moment, too rough or too narrow to meet all the exigencies of the situation: Herr v. Lebanon, 149 Pa. 222.

The frightening of a horse is a thing that cannot be anticipated, and is governed by no known rules: Worrilow v. Upper Chichester Township, 149 Pa. 40; Chartiers Twp. v. Phillips, 122 Pa. 601.

In Herr v. Lebanon, 149 Pa. 222, Mr. Justice WILLIAMS said: " The duty of road officers is to provide roads suitable for ordinary travel, conducted in the ordinary manner, and to provide such safeguards as may be needed to meet the risks of such travel: Hey v. Phila., 81 Pa. 44 ; Jackson Twp. v. Wagner, 127 Pa. 184. This is the extent of their liability in this state. The same rule is held in many other states : Warner v. Holyoke, 112 Mass. 362; Chapman v. Cook, 10 R. I. 304; Keyes v. Marcellus, 50 Mich. 439 ; Davis v. Hill, 41 N. H. 329.

It is not the duty of the township supervisors to take the initiative and institute proceedings to lay out a highway or vacate or change the site of a public road already laid out. The only duty imposed on township supervisors being to make the township road safe for ordinary travel: Hancock v. Wyoming Borough, 148 Pa. 635 ; Wagner v. Salzburg Township, 132 Pa. 647.

The township supervisors cannot control the discretion of railroad companies as to how they should build a railroad, nor can they compel them to build an overhead bridge to avoid a grade crossing: South Waverly Borough's Appeal, 20 W. N. C. 209 ; North Manheim Township's Appeal, 22 W. N. C. 149 ; Traction Co. v. Canal Co., 1 Pa. Superior Ct. 409.

*James B. Reilly*, with him *M. M. Burke* and *J. W. Ryon*, for appellee.—The degree of care which is required of road supervisors has no exact legal standard. . . . They are required to do what is practicable to be done and to preserve a reasonable condition of safety with reference to the kind of road, its peculiar location, its adjacency to places of peril and the amount and kind of travel it accommodates. It may be said generally that they are bound for reasonable and ordinary care according to circumstances : Plymouth Twp. v. Graver, 125 Pa. 24; Hey v. Philadelphia, 81 Pa. 44.

The question of defendant's negligence in this case was for the jury : Wellman v. Borough, 167 Pa. 239.

OPINION BY SMITH, J., April 12, 1897 :

This is an action against a township for negligence in the maintenance of a public highway, by reason whereof Sarah Dixon, the plaintiff's wife, was killed. The declaration sets

forth, as the negligence in the case, that the defendant " wrong-
fully, negligently and unjustly failed to maintain and keep the
said common and public highway in good order and condition,
or open for public travel to the legal width, or to keep the same
free from obstructions, and did then and there wrongfully, neg-
ligently and unjustly permit large quantities of coal, dirt, stones,
slate and rubbish to be deposited, put and placed in said public
highway, and wrongfully and unjustly then and there permitted
the same to be and remain in the said common and public high-
way, and did then and there wrongfully and unjustly neglect
and fail to keep up a guard or rail along said common and pub-
lic highway, so as to protect citizens lawfully travelling in and
along said common and public highway ; by means of which said
negligence and improper conduct of the said defendant in that
respect a certain carriage with the said Sarah Dixon therein,
going and passing along and over said common and public high-
way was thereby overturned, by means whereof the said Sarah
Dixon was greatly injured and wounded, insomuch that she the
said Sarah Dixon then and there of said injuries and wounds
died."

The undisputed facts were these : A railroad, at a point where
it ran nearly east and west, was crossed obliquely, from south-
west to northeast, at grade, by the highway mentioned in the
declaration.    For several hundred feet west of the crossing, the
railroad and highway were nearly parallel, and from ten to
twenty-five feet apart.    There was no fence between them.    At
the roadside one hundred and twenty feet from the crossing was
a " caution board " for the warning of travelers.    The railroad
track was from two to five feet lower than the highway, and the
latter descended by a light grade to the crossing.    Except near
the crossing, the view eastward, from the highway west of the
crossing, was obstructed for some distance by a large culm bank
immediately south of the railroad, and extending to the side of
the highway.    To prevent this culm from reaching the railroad,
a cribbing sixty-three feet long was erected, terminating, at its
western end, twenty-three feet from the highway.    It was from
four to six feet from the southernmost rail, and not more than
two to four feet from the sides of passing coal cars.    About fifty
feet east of the crossing, the railroad and highway were crossed
by a railway on a high trestle, on which the culm was transported

to the bank from a neighboring colliery. From the highway east of the crossing there was an unobstructed view of the railroad, on both sides, for a considerable distance. On August 8, 1884, a train of coal cars, pushed by a locomotive, approached the crossing from the west, at a moderate speed, with signal whistles that were heard by several persons east of the crossing. At the same time, the plaintiff, with his wife, and six other persons, in a closed carriage, drawn by two horses, moving at a walk, approached the crossing on the highway from the same direction. The plaintiff was on the outer seat in front, at the left of the driver. He had for some fifteen years been familiar with the road. For a distance of three hundred and fifty feet west of the crossing, he could, by turning his head, have seen the approaching cars. But, paying no attention, he neither saw nor heard them, nor noticed the signal whistles. "I did not see the train," he says, "until it was right along side of the carriage." When fifty or sixty feet from the crossing his attention was drawn to the train by some boys on the trestle. On the witness stand he thus described what followed:

"We were driving along, never thought of anything, and we saw some boys on the trestling there, and they went like that, and beckoned, making motions (illustrating) ; of course the thought struck us that there was a train coming; I thought the train was coming up from Mahanoy Plane round by the Junction. In place of that the train was coming in the opposite direction, and was right behind us before we noticed the train, and the horses began to rear. The driver jumped out and I caught hold of the reins. I kept my position, kept hold of the reins, and they got down a little distance from us in the fright in rearing, and at a certain point there we tried to turn the carriage round. We had them kind of half turned, but we could not complete the turn on account of the carriage going over against the cars that were running at the time. Some of the parties in the carriage hollered, and we let the horses pull out, and in pulling out the bank was right in front of them. They made a little start then, right for the crossing, and they saw the train on the crossing. The horses would naturally turn themselves away from the cars, but they had no room there on account of the dirt bank. We turned the horses towards the dirt bank in trying to turn round. They hadn't the room ; the

back of the carriage was backing against the cars. Then we straightened them up, and that turned them toward the crossing. When they got right to the crossing there the cars struck the carriage, knocked it up on the bank; it rolled over and was dragged right in between the cribbing—rolled right in between the cribbing and the cars. When I saw the carriage was about being struck by the train I left go of the reins and jumped just in time to save myself." The driver, meantime, had let go of the horses. The other members of the party, unable to escape from the carriage, were crushed to death between the cribbing and the cars. The plaintiff's description embraces all the material facts, and is corroborated, to the extent of their observation, by the other witnesses who testified in relation to the accident.

We have presented thus fully the averments in the pleading respecting the specific negligence complained of, the situation as described by the witnesses, and the plaintiff's version of the accident, that it may distinctly appear how far the allegata and the probata agree. Except as to the existence of the highway, and the death of the plaintiff's wife, there is absolutely no correspondence between them. There is no evidence that the road was of less than legal width, or that anything in its condition, including the absence of a guard rail, contributed to the accident. The actual cause of the death of the plaintiff's wife, and the circumstances directly leading to it, as disclosed by the evidence, are not even hinted at in the declaration. The trial judge, indeed, eliminated from the issue every aspect of the defendant's negligence set forth in the declaration, and ruled the case on a view of the defendant's obligation and default neither presented in the pleading nor legitimately arising from the evidence, but apparently suggested by the circumstance that, several years before the accident, a township road official estimated the cost of an overhead crossing, and another made some ineffectual efforts to prevail on the railroad company to construct one. It being unquestionable that, with such a crossing, the accident would not have happened, the trial judge thus, in substance, submitted the case to the jury: "If, under the circumstances of this case, there were no precautions that could have been taken for the purpose of preventing such an accident as this occurring, except by the building of an overhead bridge,

then the question arises as to whether it became the duty of the supervisors to build an overhead bridge. That is a question of fact for you to determine, which we propose to submit to you for the present, but reserving the question of law in the case as to whether the supervisors were bound to build a bridge of this kind. But the jury must understand that it must only be where there are extraordinary risks, and where there are no other reasonable means that could be taken for the purpose of rendering public travel safe."

The accident in this case was due entirely to the ungovernable movements of the frightened horses. The liability of the defendant, therefore, depends on the duty of the township to provide against the consequences of such fright. This duty is not measured by any specific rule; it is embraced in the general principle that due provision must be made against all dangers that may reasonably be foreseen or anticipated as likely to occur. Thus, in addition to freedom from defect in the roadbed, a highway must be guarded by suitable barriers where it passes a declivity or precipitous descent: Hey v. Philadelphia, 81 Pa. 44; Pittston v. Hart, 89 Pa. 389; Burrell v. Uncapher, 117 Pa. 353; or an excavation: Lower Macungie v. Merkhoffer, 71 Pa. 276; or over a stream: Newlin v. Davis, 77 Pa. 317; Scott v. Montgomery, 95 Pa. 444; Yoders v. Amwell, 172 Pa. 447; Bitting v. Maxatawny, 177 Pa. 213. Such conditions create a danger so manifest that it is negligence not to employ the obvious means of guarding against it; and this must be done so effectually that even skittish animals may pass with safety: Lower Macungie v. Merkhoffer, supra. But " as a general rule, the supervisors are in no way responsible for the condition of the surface of the land outside the limits of the road: " Plymouth v. Graver, 125 Pa. 24; and " Where no danger may be anticipated from a cause existing beyond the limits of the roadway, no duty in respect to such cause has ever been held to devolve upon the supervisors : " Worrilow v. Upper Chichester, 149 Pa. 40. With respect to the fright of a horse as a source of danger, it was said by Mr. Justice MITCHELL, in Horstick v. Dunkle, 145 Pa. 220 : " The precise limits of liability where the element of an unruly or frightened horse enters into the causes of an accident on a public highway, have been the subject of some controversy and some difficulty. It is conceded that our

cases hold the township authorities to a more exacting rule than obtains in some other states, but none of them go so far as to say that they must make roads safe for runaway horses. The subject was carefully considered in the recent case of Jackson Township v. Wagner, 127 Pa. 184." In the latter case, the governing principles were thus laid down by Mr. Justice WILLIAMS: "Township officers are bound to anticipate and provide against the ordinary needs of travel conducted in the ordinary manner, and to remove obstructions and defects which would naturally or probably cause injury to the traveler along the highways; but the township is not an insurer against all possible accidents, nor is it bound to anticipate the danger to which a broken wagon or a frightened horse may expose the driver. Such a burden would be too heavy for any township to bear, and the law does not impose it. The general rule is well stated in Hey v. Philadelphia, 81 Pa. 44, to be that "roads and bridges are made for ordinary travel; if they fulfill such purpose they are sufficient, and those in charge of them are not responsible for extraordinary accidents occurring on them." In Scranton v. Dean, 2 W. N. C. 467, referring to Hey v. Philadelphia, the Supreme Court said : " The ground of our decision in that case was the peculiarly dangerous character of the locus of the accident, by reason of the presence of the railroads, and we did not intend to, nor did we decide, that highways must be kept in such a condition that unmanageable or runaway horses will suffer no injury."

The negligence of the township, moreover, must be the proximate cause of the injury. If a defect in the highway be merely coincident with a distinct and unrelated cause, for which the township is not responsible, and without which the injury would not have happened, the latter is to be regarded as the proximate and the former the remote cause : Chartiers v. Phillips, 122 Pa. 601; Jackson v. Wagner, 127 Pa. 184; Herr v. Lebanon, 149 Pa. 222; Schaeffer v. Jackson, 150 Pa. 145. In the case last named, a horse took fright at some donkeys in the road, and suddenly turned around, breaking down a wheel of the carriage. The driver losing control of the animal, he ran, dragging the end of the axle on the ground, until opposite a stone pile by the roadside. At this point the end of the axle dropped into a hole in the road, and the plaintiff was thrown out on the stone

pile. It was held that the township was not liable; the fright of the horse being deemed the proximate cause of the injury and the defect in the highway the remote cause. Mr. Justice HEYDRICK, reviewing the authorities in this and other states, said: "When, from extraordinary causes, for the existence of which the supervisors are not responsible, and of which they cannot be presumed to have had notice, a driver loses control of his horses, and they come in contact with a defect in the highway, there is no more reason for holding the township answerable for a resultant injury than there is for holding any other party responsible for the result of the concurrence of something which he could not foresee, with his negligence." In such cases, the operating causes cannot be regarded as concurring causes, for the consequences of which the party responsible for either might be held liable. The distinction between them is lucidly defined by Mr. Justice WILLIAMS, in Herr v. Lebanon, supra: "If two distinct causes are operating at the same time to produce a given result, which might be produced by either, they are concurrent causes. They run together, as the word signifies, to the same end. But if two distinct causes are successive and unrelated in their operation, they cannot be concurrent. One of them must then be the proximate and the other the remote cause. When they stand in this relation to each other and the result to be considered, the law regards the proximate as the efficient and responsible cause, and disregards the remote."

In the case before us, two independent and unrelated factors contributed to the result: (1) The fright of the horses; (2) The culm pile and cribbing at the side of the railroad. For neither of these was the township responsible. As in Schaeffer v. Jackson, and Worrilow v. Upper Chichester, supra, the proximate and efficient cause was the fright of the horses, arising from a source over which the township had no control. And here the township had also no control over nor responsibility for the culm pile and cribbing that formed the remote cause. These, like the stone pile on which the plaintiff was thrown in Schaeffer v. Jackson and the tree struck by the plaintiff's carriage in Worrilow v. Upper Chichester, did not cause the accident, but only tended to make its consequences more serious. Furthermore, to create a liability, the result must be a consequence so probable that it ought to have been foreseen and

guarded against. The supervisors might indeed foresee that horses on the highway were liable to be frightened by moving trains; and had the animals in this instance run into a train by the roadside, as in Plymouth v. Graver, 125 Pa. 24, the question of negligence on the part of the township might have arisen. But supervisors cannot be required to anticipate the possible or probable movements of a frightened horse, except where there is an obvious source of danger, such as a declivity or excavation by the roadside, or a bridge not properly guarded. In the case before us, they could not have reasonably foreseen that horses, frightened by a moving train, would take such a course as to bring them between the cars and the cribbing; on the contrary, this would appear highly improbable. The township cannot be held guilty of negligence for failure to anticipate and provide against a result of fright which could only be suggested as a remote possibility. Such a provision cannot be regarded as "an ordinary need of travel, conducted in the ordinary manner," for which, as was said in Jackson v. Wagner, supra, the township is bound to provide.

The vice of the ruling below lies in its assumption that, the crossing being a dangerous one, the township was by law required to provide means of wholly avoiding the danger. All grade crossings are dangerous, and in this respect the difference in them is only in degree. The liability of the township, however, is not based on danger but on negligence. And so far as the element of danger is involved, we must take into account, for the purposes of this case, only the dangers to which the plaintiff's wife was actually subjected; not those to which she might have been exposed under different circumstances. In approaching the crossing from the east, the danger was not greater than at other grade crossings, as the railroad track was in full view in both directions, for a distance permitting the timely discovery of an approaching train. In approaching from the west, with a train coming from the east, the danger was greater, by reason of the obstructions to the view from the highway in that direction; but as no train, in the present case, was coming from the east, this danger was not encountered. In approaching from the west, as the plaintiff's wife did, with a train coming from the same direction, there was no danger that could not readily be discovered at a sufficient distance from the crossing

to be avoided by a timely halt.    Travel in the ordinary manner implies ordinary care on the part of the traveler.    With the evidence as to the dangerous character of the crossing, there is evidence that it was dangerous, when a train was approaching, to stop within fifty or sixty feet of it with horses liable to take fright at the cars.    Under the circumstances, the peril to which the plaintiff's wife was actually exposed, at the crossing, was by no means of such an extraordinary character as to require the bridging of the railroad as a means of escape.    On the contrary, with timely attention and reasonable care, there was no difficulty in avoiding it, except so far as it might arise from fright on the part of the horses ; and the surrounding conditions were not of such a character that the supervisors were bound to foresee and provide for this element of danger.    The township was not required to insure against accidents, nor to construct a bridge in order to make the crossing absolutely safe.    The Act of April 12, 1855, P. L. 220, extending the statutory provisions respecting bridges over watercourses to the erection of bridges over railroads, has never been construed as requiring all railroad crossings to be bridged ; its evident purpose is to give such bridges, when required for the ordinary needs of travel, the status of other bridges with respect to liability for the cost of construction—this being borne, in some cases, by one or more townships, and in others by one or more counties.

It was assumed by the court below that the erection of an overhead crossing was reasonably within the means of the township.    There was no evidence on this point.    But even assuming that the burden was on the township to show lack of means, in relief of its supposed obligation to bridge the railroad, there was nothing in the pleading to give notice that such an obligation would be contended for on the part of the plaintiff, and that a failure by the defendant to perform it would be set up as the negligence complained of.    When an obligation so extraordinary is alleged as the basis of the action, some intimation of it should be given in the pleading, in order to throw on the defendant the burden of meeting the allegation.

It is unnecessary to consider the assignments of error in detail.    It is sufficient to say that the 7th and 9th are sustained, and the judgment is reversed.